Good morning. May it please the court. My name is Thomas Haney. I'm from Phoenix, Arizona, and I represent Robert Stewart in this matter. This appeal is really about words and mere words in a confinement setting between inmates with little access to the outside world. The chief witness in this case was a career criminal, an informant. The defendant was an unhappy, bitter, harmless person without resources and without friends and associates. The case was built up and promoted by the career criminal in order to enhance his own position in the prison system and to promote his own release. In counts one and four, it's really almost the same thing. They have common language of threats, assault, and solicitation. What amounts to by convicting the defendant of counts one and four is almost a double punishment. Under count four particularly, it's a solicitation statute where no physical acts or no corroboration. Well, corroboration is required, but there are really no physical acts in this case other than the words between the inmates. Do you need anything besides that to violate the elements of the statute? Does that actually show an attempt was made? There should be an attempt. There needs to be strong corroboration. In this case, I submit there is not strong corroboration for count four. There must be more than something. And in all of the six cases decided under that, there was in four of them there was actually some physical matter done. In the Buckaloo case, there were overt acts of the bank robbery. In Dvorkin, which is a Ninth Circuit case, there was money in photos exchanged. In the Gabriel case, there was money provided. And Korob was reversed for no federal offense. McNeil, there were actually written letters from the defendant corroborating his culpability. And then Raymond Raman was reversed because of the insufficiency of the evidence. In our case, there is an insufficiency of evidence in regarding count four because, in fact, the only thing implicating the defendant are the words of August Weiss, the informant. And what's purported to be corroboration is, in fact, a tape recording that has scant little words on it except a few words about the judge, about an age, and about an office address of 624 in the federal building in Phoenix, and little more. All of the things about... Isn't that enough to point right at Judge Silver? Well, it's certainly enough to point at Judge Silver. But what you have is two inmates in a setting with little to do except talk about their predicament. And they talk about their case. They talk about how they got there. They talk about lawyers. They talk about who they knew. These people are just talking, and they have no access to the outside world and no way to implement anything. And it's a mistake for the government to go into these prisons and say, well, gee, maybe we can have a case here. These people are sitting in there talking about how much they'd like to do in someone. Judge, they just have no access to that. Didn't your client say that he was going to get $100,000 from the Aryan Brotherhood to kill Judge Silver? My client has no access to $100,000, no access to the Aryan Brotherhood. What he was saying, and what you can hear on the tape about the Aryan Brotherhood, is that he told Mr. Weiss that when he was in the pretrial setting, there had been a discussion. He had heard that the Aryan Brotherhood was after the judge. That was the one who wanted to do in the judge, not my client. My client was under appeal, and he had no reason. In fact, he got a very generous sentence from Judge Silver, who could have given him more than the five years that he was given for that offense. But what is your position, that this is just idle chatter, that it's not a solicitation, it's just locker room talk, or what? This is idle chatter between disgruntled inmates, on the one hand, my client, and the August Weiss, the professional informer and criminal, on the other, to manipulate to see what he could get for his own advancement. You don't feel as if a reasonable jury could conclude, beyond a reasonable doubt, that he's soliciting the killing of the judge? My client was not soliciting the killing of the judge. There is no rational jury could have believed August Weiss, when you consider the fact that he lied on the witness stand, he conceded he was lying when I cross-examined him, he has conceded on direct exam that he had three convictions, he conceded on cross-exam that he had eight. He said he used five aliases on direct exam. He conceded 30 or so on cross-examination. He said that on direct exam, this is my only case have I ever been an informant, he said. On cross-exam, he admitted there had been three occasions when he was an informant. He was an absolutely unbelievable witness. Unfortunately, all of the impeachment didn't really work on this case. That argument is good before a jury, but is it good to an appellate court? The jury chose not to accept that. They believed him. Apparently, they did believe him. But if you consider the entire record, no rational jury could really believe him. And there is insufficiency of the evidence, and there is insufficient corroboration. The only allegations of cutting off the judge's head and putting it on a pole is the figment of the imagination of August Weiss. That is not on the tape. There's nothing on the tape of that nature. The only thing on the tape is a discussion about sailboats, and then they get to Silver and the Aryan Brotherhood and Room 624. My client spent two years going in and out of the federal courthouse. Of course he'd know what the room number was. And if you listen to the tape, it was August Weiss who was doing most of the talking and doing most of the leading. My client never intended any harm against him, and by doing both counts one and four, the government has basically doubled up on the allegations. Your theory is that Weiss started this whole thing himself? Absolutely. This was his idea? Absolutely. And in effect, Stewart is sort of an innocent pawn in all of this? An innocent pawn who talks too much. You never pleaded entrapment, though? That was not the theory of your case here at all? Not the theory of the case. Well, then how can you answer Judge O'Scanlan that way? That's not the theory that you tried this case on. You never made a motion saying there was entrapment? We never made a notion there was entrapment. My client denies that he said anything that constituted a threat or a solicitation. That's what he denies. He did not get it. He got inveigled into talking to Mr. Weiss, who was fixed up with a wire, and that's, of course, another subject that we can discuss today. Do you claim that the wire was unconstitutional? I think that I didn't challenge the wire as to the propriety of utilizing it. The wire was challenged on the basis that the government did not preserve the initial recording device. That's best evidence rule, right? Yes, exactly. And when you consider the corroboration, there just isn't enough corroboration from the recording to really give the matter credence. Moving on, if I can, to counts two and three. This is sort of a doubling up also. The agents have the tape recording as of the first interview with Mr. Stewart. And on the first interview, they go to him and they discuss the Aryan Brotherhood and the conspiracy issues. Mr. Stewart rationally says, I'm not conspiring to do anybody. I wasn't conspiring to do anybody in whatsoever. They go back two months later in January, and they say, well, now what about this again? We've got a recording here we'd like you to listen to. And Stewart listens to it and he says, well, that's fine, but I still didn't do it. Mr. Stewart didn't even know any more than he was denying the fact that it happened because he never conspired to do it. And that was the allegation. And although the Brogan case in 1998 removes the exculpatory no defense, what we have here is the government had all of the information it allegedly needed for count one or for count four. Count four was added later in a superseding indictment. They had all the information they needed. The only purpose in interviewing Mr. Stewart then was to either get admissions, which of course would be fine with the government, or in the alternative to get a no answer and allege that he is lying. And this they did on two occasions. And I think there's a particular portion of the Brogan case in a concurring opinion by Judge Ginsburg that I'd like to refer to, where an oral argument, the solicitor general observed that U.S. Code 1001 of Title 18 could be used to escalate completely innocent conduct into a felony. If the investigator finds it difficult to prove elements of a crime, he or she can ask questions about other elements to which they already know the answer. If the suspect lies, she can then use the crime she has prompted as leverage or can seek prosecution for the lie as a substitute for the crime she cannot prove. So here's a case where the government had nothing to lose. Either they get admissions, which they didn't get because Stewart didn't do anything and couldn't admit it, or in the alternative he denies it and they claim that he's lying because they have Mr. And a couple of words on a recording. Do you think that the government shouldn't have asked questions of Mr. Stewart to find out what his side of the story was before proceeding to indict? Doesn't it seem rational to at least talk to the target defendant and see if he's got a version of facts which exculpates him? You might talk to him, but if he denies it, then he's committed another crime. Under Brogan, I think I'd be afraid to talk to a federal agent. Well, that might be good advice to your client. Well, fortunately, I wasn't there. And if you read the Brogan case, it goes into what occurred to Brogan because he had no lawyer there and they confronted him with things that they already had so-called proof of. And then when he denied it, they have another case. Is this really what we want government to go out and do? If you say that, well, the government should have talked to Stewart to have gotten his side of the case, particularly in view of the character that was accusing him, that's fine. But do we have to make another count out of it and make another two counts? This is where I submit we're overblowing prosecution these days with almost nobody ever charged with a single count for a crime they may have committed. But they have to load it up with two, three, and four counts, whether it's for plea bargain material or whether it's just because they have the resources to do it. I can't speculate. But it seems that a case where two inmates are locked up and my client is in an institution to come up with some kind of theory that he had any wherewithal, any resources to do other than shoot off his big mouth is preposterous. The mail is screened in the prisons. The phone calls are recorded. How could he possibly come up with any payment? I'm court-appointed counsel. I was court-appointed counsel in his trial. He has no resources. He has no funds. He has no... Why aren't you making a jury argument when you say that? That well may be, but that's not the law. He lied on two occasions to a federal officer. Whether or not he was able to bring that to fruition is a credibility matter. That's not an appellate matter, is it? But it's their contention he lies. He didn't know he was lying because he didn't do it. Therefore, to deny it would only be human and natural. Well, the jury found that he knew what he was doing the first time, and he lied about it the second time. It's not a credibility matter. It's not a matter of law. Well, it certainly is a credibility matter, excepting if a rational jury could buy it. And unfortunately, my arguments to the trial judge to dismiss counts two and three, or one of them, as doubling up under the Olsoe case, then I guess I lost that one, too. But the fact of the matter is it should have been certainly the second count of deceit should have been dismissed under Olsoe, where exculpatory no's are the same question, same answer. That's a Ninth Circuit case that essentially says, I cite it in my brief, and it essentially says that the same answers to the same questions cannot be held for a second count. Because it's duplicitous. Because it's multiplicitous, whatever it is. Well, why is it multiplicitous if it's done on different occasions? You lie today and you lie about it again tomorrow. It's not two violations of the same statute, but it might be about the same subject, but you lied on two separate occasions. Well, they may have lied on the two separate occasions, but Olsoe holds that the same answers to the same questions can only be one count under 18 U.S. Code 1001. That's the case that I cited. It's a good case on that point. What the government has done here, they said, well, it was different questions. It was a different tenor. This time we played the tape recording on the second time. They could have played the tape recording the first time. They could have done all of this with one interview. In fact, it was a method of ballooning the charges against the defendant. And I submit that that should be unconstitutional. It's unfair. It's manifest injustice. I'd like to go on to mention in the sentencing aspect of this. After after the initial brief was submitted, the three weeks before the appellee submitted the brief, the the Supreme Court decided the Blakey case. And I cited the Blakey case in my response reply brief. And the government moved that that argument be stricken. And we received an order from this court dated September 10 that said that I could request to file a supplemental brief after Booker and Fan Fan are decided. So on my argument, seven on the sentence being excessive and so on, it would appear that all of that would be most appropriate either in a supplemental brief at the time Booker and Fan Fan already are decided, or as this court has also done in some other cases, simply send the case back to the the trial court for the purposes of reviewing those decisions and that sentencing. If you were not to reverse it on the basis of the arguments that I set forth in my brief and that submitted. You certainly preserve that issue perfectly well in the record here. We are all waiting to see what the Supreme Court does. And obviously we'll be guided by that. All right. Why don't you. Thank you. Thank you. Good morning. Please the court counsel. I am Assistant United States Attorney Patrick Schneider and I represent the appellee. I would like to if I could start out by talking a little bit about the corroboration of Mr. Weiss. The appellant made a great deal of argument suggesting there was no corroboration for Mr. Weiss and that no reasonable jury could have believed him. There was substantial corroboration of Mr. Weiss in this case. It was first of all, there was Judge Silver herself who testified at trial, who talked about the defendant in the prior trial and talked about the way that his demeanor changed during the course of that trial. How his demeanor changed from one that started out as very respectful to one by the end of trial that she described as smoldering rage. You had Special Agent Galante with the FBI who testified about the interviews that he had done with Mr. Stewart and he talked about his demeanor while he was doing that interview and how Mr. Stewart and Judge Silver and talk about this issue would become very animated. And that's consistent with what Mr. Weiss testified to that when he would have discussions with Mr. Stewart in prison and discuss the judge in his case, that Mr. Stewart would become very animated about this issue, that he became quite exercised whenever he talked about Judge Silver. And when he started talking about these issues about what should be done, what's wrong with the courts, what's wrong with the law, and Mr. Weiss talked about the fact that he was, in fact, within the prison, within the unit, they were in a shot collar, and that he was the kind of person then that someone might come to believing that they had the ability to carry out these types of offenses. Was there any evidence at all that Mr. Stewart had the resources or ability to carry out these threats or to mount a conspiracy to kill the judge? Your Honor, there was some evidence in that nature of this. Mr. Stewart himself admitted to Agent Kalante in the first interview that, in fact, he was aware of there being a $100,000 contract out there by the Aryan Brotherhood to have Judge Silver killed. He admitted to Agent Kalante that much, that he was aware that there was this money out there, and he also admitted on cross-examination. Was there any evidence that Stewart had any connection with the Aryan Brotherhood, or was this just barroom talk? There was not. While there was some testimony on his behalf that he knew some people within the Aryan Brotherhood had had some contacts, there was no evidence he was a member. But he did, in fact, admit on cross-examination that he had told Mr. Weiss that he could put him in touch with people in the Aryan Brotherhood about this $100,000 contract. Now, he suggested in his cross-examination that that was because he believed Mr. Weiss simply wanted to make money by becoming a hit man for the Aryan Brotherhood, and he didn't believe that it would ever work out. But he himself admitted on cross-examination that he had, in fact, told Mr. Weiss that there was this $100,000 contract. Doesn't it seem to you a little bit bizarre that Stewart would use Aryan Brotherhood money with a man named Weiss? It sounds like a Jewish name. To kill a judge named Silver? Well, Judge, all I can tell you is that it seems somewhat obviously interesting in the sense that the man doesn't have access to money himself, so he's got to leverage others. But there's also the What's his connection with the Aryan Brotherhood, other than perhaps a fantasy that he knows some people in the Aryan Brotherhood? Was there any proof that he actually knew anybody in the Aryan Brotherhood? No. There's no suggestion that he had close connections with anyone in the Aryan Brotherhood. But maybe he read about it in a gun magazine, right? That's certainly one interpretation, Your Honor. However, in addition to the money, there were also the machine guns that he offered to pay Mr. Weiss with. And on the tape that was introduced into evidence, he describes those machine guns. He describes the type of machine guns that they are, that they've got a side-mounted magazine, that they've got no safeties, that they're 9mm Parabellum machine guns. The very type of machine gun that he was arrested with Where they are or how they could be accessed? On the tape, he tells Mr. Weiss that he's got someone on the outside that can get him those weapons. And he goes on to describe these weapons. Those are the exact type of weapons that he had in his possession when he was arrested in 2000 by the Bureau of Alcohol, Tobacco, and Firearms. Where would I look to see any evidence that Stuart knew some people in the Aryan Brotherhood? If you looked at Mr. Stuart's testimony in cross-examination, you would see in there that he admits on the witness stand that, in fact, he had some contact or overheard a conversation while he was in a pretrial detention facility and was aware of the Aryan Brotherhood contract. What's wrong with the appellant's argument that this is locker room talk by federal defendants who are serving long prison terms, are obviously disgruntled, and are making these wild allegations they're going to kill the judge. And they're saying they have $100,000 from the Aryan Brotherhood. There's no proof that they actually had that. There's not even any proof that they were able to deliver the machine guns as payment or for use of it. Why isn't this just a lot of stupid talk by inmates that have nothing better to do but serve time and have a fantasy? Your Honor, I guess I think that the test is not did they have the ability to carry through, but would the reasonable listener have believed that the threats were, in fact, serious, that they did intend this. And I think that the evidence suggests and corroborates that, in fact, the threat was real. We've got Mr. Stewart himself who, when he was on the witness stand, in his demeanor he became very animated again in talking about the judge. He went into his beliefs that the right to possess guns are a right that comes from God. He talked about rulings from Judge Silver that made his fur bristle. He talked about knowing the judge's name and the fact that her last name was different than her husband's because he had people checking up on the judge. When asked about how it is that he was able to give Mr. Weiss the age of the judge within one year of her actual age, he responded by saying it was a lucky guess. He provided all that information to Mr. Weiss concerning the judge's description, her age, her physical description, her physical location, where she could be located and what Mr. Weiss should anticipate the security to be around the court building, the likelihood that someone to carry this out might get caught. He talked in letters that he had sent out. He admitted when he testified that he had sent letters to a friend of his in Ohio, a Mr. Hartman, in which he indicated that the judge would get hers in the end and that he also indicated that, in another letter, that these federal officials had committed, brought upon themselves the charge of treason. He admitted... There's no question. The record is totally full of his disdain for the judge, and I dare say that most inmates in federal penitentiaries that are serving long prison terms are not wishing the sentencing judge good health and long life. But what you have here that sets that aside, showing that he has the intent to do her harm, he doesn't like her, obviously. And how could a jury really think that an inmate locked up as he is, without funds, without really friends, can pull this off? I think there are probably a couple of things, Your Honor. One is when he testified on the witness stand, he was asked questions like that by Mr. Haney. He was asked, do people in prison often express their being unhappy with their sentence and with their judge? And the defendant's response was to describe those people as whiners, to suggest essentially that he was not one of those people that's a whiner. And then subsequently, in his own defense, he brought in a character witness who testified on his behalf, and on cross-examination he testified that, in fact, the defendant is a man who means what he says. So I think those two things are some of the evidence that helps us conclude that this was not simply idle chatter, this was not simply locker room talk, but there was indeed corroboration circumstances that would lead one to conclude that this was a serious expression of Stewart's intention to kill Judge Silver. I wanted to talk briefly about the recording. The recording device, as was indicated in this case, was destroyed, or not destroyed, but was not preserved. What transpired was this digital recorder was used to record the conversation that occurred between Mr. Weiss and Mr. Stewart. It was subsequently taken back to the FBI, where the digital information from that device was downloaded to a computer and placed on a disc, and the disc was preserved. The recording device itself was placed back into use by the FBI. The best analogy that I could make would be to suggest that it would be very much like a digital camera, that the photographs were captured digitally on the device. They're subsequently downloaded to a computer. For purposes of presenting that evidence, what you would need is someone that could look at the photograph and say that's an accurate representation of what transpired. That's what took place here. You had Mr. Weiss who testified that, in fact, he'd listened to that. He could confirm, in fact, that that was substantially the conversation that took place with he and Mr. Stewart. How about the duplicitous nature of counts two and three? Your Honor, I will concede that counts two and three are close, but what I would submit to the Court is that the reason for going there was not, Agent Galante testified it was never to go back simply to make additional charges. What transpired here was that in November he went and he interviewed the defendant. He did not have the tape recording with him at that time. He sat down with him and he said, I have reason to believe that you may be involved in some conspiracy to harm a federal judge. Mr. Stewart said, no, I'd never want to harm my federal judge, but I am aware that the Aryan Brotherhood or some other white supremacist group out there might want to have her killed and there might be this $100,000 out there for that to happen. In essence, sort of shifting the blame to the Aryan Brotherhood. Beyond that, he says he knows nothing, that he's not involved in any way, shape or form in threatening his judge. The agent then goes back in January of 2003. This time he takes the recording with him and he plays to him a portion of that recording. He first tells him again, are you sure there's nothing you could have said that could be interpreted as a threat to any federal judge? Mr. Stewart says, absolutely not. He plays him that portion of the tape, specifically the portion that describes Judge Silver, where she's located her physical description. He says at that point, Mr. Stewart becomes very physically animated. He jumps up and he says, that's a wire. He doesn't say, I don't know what that is. I've never heard it before. I never made those comments. What he says is that's a wire. And then he makes comments to the effect, I think I know what this is. There was this inmate named Weiss, and he was asking me a bunch of questions. And I think he's the guy that's behind all this. So in essence, on this second interview, Mr. Stewart shifts the blame now from the Aryan Brotherhood to now Mr. Weiss. It was Mr. Weiss who was putting him up to this, Mr. Weiss who was interested in asking him these questions about his judge, and Mr. Weiss that is, in fact, the one who precipitated all of this. But the indictment claims that the lying to the federal agent is in denying his culpability with respect to the threat, not two different versions. Yes, but I think that it's still relevant for purposes of determining whether or not the answer is the same. He still denies, no, I'm not involved. And the agent testified that his reasoning in doing this was this, is that at this point in time what he knows is that at least by what he's heard from Mr. Weiss and what he's heard from Stewart in the first interview is this money may be out there, and there may be others that are intent on doing harm to Judge Silver. Or Mr. Stewart himself may, in fact, be trying to have the murder still carried out, but going through someone other than Mr. Weiss. He's endeavoring to go back and try to make a determination as to whether or not Mr. Stewart might have approached someone else besides Mr. Weiss to attempt to have the murder carried out. To determine whether the indictment is duplicitous, we do not have to find that there was an improper motive by the federal investigator. All we have to do is look at did he deny the same thing twice, because otherwise the counsel might be arguing that they go back in there every day and get a denial every day and then mount up the counts just for purposes of negotiation. No, you're correct, Judge. And I think the test is did he say the same thing twice and did it cause the agency to have to do something else in the course of its work that it would not otherwise have done. I think that's the two-part test. But you're correct. So the question really is, I think, did he simply say the same thing twice and did, in fact, the FBI have to go to additional work because of those statements that they would not have gone to otherwise. I would agree with the court on that. And as counsel pointed out, the investigation was complete at that point. The only thing they hadn't done was talk to Stewart. There was no further investigation done after talking to Stewart. Well, there was in the sense that Agent Galante testified that they were continuing to keep an eye on all of the mail coming out from Mr. Stewart. They were attempting to contact every one of his relatives because what they were trying to determine was whether or not, through his relatives or friends, he had anyone that he could contact on the outside to actually make the transfer of those machine guns. And so they were endeavoring to do that. The investigation was not complete at that point, contrary to what Mr. Haney said. It was in the sense that Mr. Weiss's active or proactive role was completed at that point. If the court has no further questions. No further questions. Thank you, counsel. Thank you. Mr. Haney, you have some reserved time. Thank you, Your Honor. I think it should be fairly apparent my client is a strict constitutionalist and has some very strong feelings about the Second Amendment, which has got him into his predicament in the first place. His knowledge of machine guns or the machine guns on which he was convicted of possessing and which he fashioned in his machine shop. And, of course, he knows the nomenclature and the nuances of the device and could talk about them and did talk about them amongst the inmates with some detail. Nevertheless, he didn't have any machine guns after he was sentenced. The government has them all. And the discussion, there is a word about his sister on the tape, and his sisters, he has two, were interviewed by the FBI. One of them was called by the defense at the trial. She has no machine guns, no access to same. They live in Utah, out of state from Arizona, and they never had anything to do with his conduct of being in the arms business to the extent he was in the arms business. So, basically, the fact that he can articulate the nomenclature doesn't really implicate any guilt. And he had no one on the outside, and no connection was ever found other than the reference to his sister, and they were both interviewed. And as far as investigations go, I would submit the very reasonable hypothesis that the government really doesn't close any investigation until after the trial. There's always a continuing monitor, and there's nothing the matter with that. But the government corroborates what I have said, that the inmates have no access to the outside world that isn't monitored, and it would have been literally impossible for him or Mr. Weiss to have any connection other than some kind of an inner desire, perhaps, but any connection with the outside world to promote a crimes that have been promoted here. So, I submit that this case is one of mere words that simply never needed to have occurred. I think it's a tragedy when we go beyond the conspiracy statute under 371, where two people who agree to commit a crime must make some overt act. Now we've gone to the point on solicitation. There doesn't need to be any overt acts, just the vague illusion, strong corroboration, which is whatever you want to argue it to be. And I submit the case should be reversed. And thank you. Thank you, counsel. The case just argued will be submitted for decision, and we will now hear argument in U.S. v. Kessler.
judges: O'scannlain, Cowen, Bea